IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ALBERT ESPINAL

CRIMINAL CASE NO.

1:11-cr-00060-ODE-RGV

## ORDER FOR SERVICE OF FINAL REPORT, RECOMMENDATION, AND ORDER

Attached is the Final Report, Recommendation, and Order of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Local Criminal Rule 59(2)(a)-(b).  Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  Failure to object to this Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.**  The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 29th day of August, 2011.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ALBERT ESPINAL

CRIMINAL CASE NO.

1:11-cr-00060-ODE-RGV

## FINAL REPORT, RECOMMENDATION, AND ORDER

Defendant Albert Espinal ("Espinal"), a/k/a Remy, is charged along with five co-defendants in a ten-count indictment. [Doc. 1]. Specifically, Espinal is charged with conspiring to take and obtain and actually taking property consisting of illegal drugs and proceeds from drug trafficking by means of actual and threatened force, violence, and intimidation from the presence of individuals engaged in an activity affecting interstate commerce, and with knowingly obstructing, delaying, and affecting commerce and the movement of articles and commodities in such commerce by robbery in violation of 18 U.S.C. §§ 1951(a) and 2. [Id.]. Espinal is also charged with knowingly attempting to possess with the intent to distribute at least five kilograms of cocaine, and with knowingly possessing with the intent to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1),

(b)(1)(A), (b)(1)(B) and 18 U.S.C. § 2. [Id.].[1] Pending before the Court are Espinal's motion for a bill of particulars, [Doc. 33], and motion to suppress evidence and statements, [Doc. 31].[2] Following an evidentiary hearing on Espinal's motion to suppress,[3] the parties filed a stipulation as to certain facts, [Doc. 56], and post-hearing briefs, [Docs. 58, 60, & 64], and the pending motions are ready for ruling. For the following reasons, Espinal's motion for a bill of particulars, [Doc. 33], is **GRANTED**, and it is **RECOMMENDED** that his motion to suppress evidence and statements, [Doc. 31], be **DENIED**.

## I. DISCUSSION

### A.   Espinal's Motion for Bill of Particulars, [Doc. 33]

Espinal has filed a motion for a bill of particulars with regard to several counts of the indictment pursuant to Federal Rule of Civil Procedure 7(f).  [Doc. 33]. Specifically, Espinal seeks the identification of the "other known" unindicted co-

---

[1] The indictment also includes a forfeiture provision.  [Doc. 1 at 11-13].

[2] Additionally, co-defendant Jose Reyes ("Reyes") has also filed pretrial motions in this case, see [Docs. 25 & 26], which will be addressed in a separate Report and Recommendation.

[3] See Doc. 55 for a transcript of the evidentiary hearing held on May 19, 2011. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, Espinal submitted an exhibit during the hearing, which will be referred to as "(Espinal Ex. ___)."

conspirators as alleged in Counts One, Six, Seven, Eight, Nine, and Ten of the indictment, arguing that the information is essential to his defense.  [Id. at 4].

Rule 7(f) of the Federal Rules of Criminal Procedure provides that the Court "may direct the government to file a bill of particulars."  Fed. R. Crim. P. 7(f).  "The purpose of a true bill of particulars is threefold: 'to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense.'"  United States v. Reddy, Criminal Action File No. 1:09-CR-0483-ODE/AJB, 2010 WL 3210842, at *5 (N.D. Ga. Apr. 5, 2010), adopted as modified by 2010 WL 3211029, at *1 (N.D. Ga. Aug. 11, 2010) (quoting United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985)).  See also United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981).  The information sought by Espinal regarding the identity of the "other known" unindicted co-conspirators is within the proper scope of a bill of particulars.  See United States v. Barrentine, 591 F.2d 1069, 1077 (5th Cir. 1979) ("A bill of particulars is a proper procedure for discovering the names of unindicted coconspirators who the government plans to use as witnesses.").  See also United States v. Belfast, No. 06-20758-CR, 2007 WL 1879909, at *4 (S.D. Fla. June 29, 2007) ("[S]ome courts in this circuit have granted a bill of particulars when it sought the names of unindicted co-conspirators and the

3

defendant did not know who they were.") (citing <u>United States v. Keller</u>, 916 F.2d 628, 634 (11th Cir. 1990) ("'an essential element of the offense is the identity of the individuals who agreed'")).  The government has not opposed Espinal's motion, and it is hereby **ORDERED** that Espinal's motion for a bill of particulars, [Doc. 33], is **GRANTED**.

**B.**   <u>**Espinal's Motion to Suppress Evidence and Statements, [Doc. 31]**</u>

Espinal moves to suppress evidence and statements obtained as a result of his stop, detention, and subsequent arrest on July 9, 2009, [Doc. 31], which the government opposes, [Docs. 58 & 64].  Espinal contends that the officers violated his Fourth Amendment rights when they initially stopped and questioned him without reasonable suspicion on July 9, 2009.  [Doc. 60].  Specifically, Espinal contends that nothing gave rise to the conclusion that he was engaged in serious criminal activity that would warrant his detention.  [<u>Id.</u>].  As such, Espinal maintains that any statements and evidence, including the court order and backpack recovered from the truck and the suspected cocaine recovered from his person, resulted from the government's exploitation of that illegality and should be suppressed.  [<u>Id.</u>].

**1.**   **Statement of Facts**

On July 9, 2009, Gwinnett County Police Department ("GCPD") Sergeant

Samuel Brustein ("Sgt. Brustein") and Officer Josh Dickerson ("Officer Dickerson")[4] were directed by the GCPD to investigate a suspicious vehicle that was parked in the parking lot of a 24-hour McDonald's fast food restaurant located near the corner of Satellite Boulevard and Duluth Highway in Gwinnett County. (Tr. at 6-8, 18-19, 40-41; Espinal Ex. 1). Sgt. Brustein and Officer Dickerson arrived at the scene in a marked patrol vehicle at approximately 1:40 a.m. and parked their vehicle somewhere behind a Ford F-150 truck that was parked in the corner of the parking lot behind the McDonald's restaurant, and the officers observed that the windows of the truck were down and that a Hispanic male, later identified as Espinal, appeared to be asleep in the front passenger seat of the truck. (Tr. at 7-9, 17, 24, 40-41, 49-52, 62; Espinal Ex. 1).[5] No one else appeared to be inside the truck other than

---

[4] Sgt. Brustein testified that in July of 2009, he was a crime suppression supervisor with the GCPD, that he had been with the GCPD since June of 1997, and that he was a police officer in Alabama for the two years prior to his employment with the GCPD. (Tr. at 6-7). Additionally, Officer Dickerson testified that he was currently employed as a police officer by the Lawrenceville Police Department, but that in July of 2009, he was assigned to the crime suppression unit at the GCPD. (Tr. at 39-40).

[5] Sgt. Brustein and Officer Dickerson testified that the GCPD directed them to investigate a suspicious vehicle without providing them with any further details, and that they did not know who had initiated the initial suspicious vehicle complaint. (Tr. at 8, 19, 21-23, 25, 40-41, 56, 58). However, Sgt. Brustein also testified that they were aware that this particular McDonald's restaurant had been robbed on numerous occasions, and that once they arrived on scene, it was suspicious to them that there was a vehicle with its windows down and a passenger who appeared to be sleeping in the passenger seat parked late at night in a business parking lot

Espinal.  (Tr. at 8-9).

Sgt. Brustein and Officer Dickerson, both of whom wore uniforms that clearly identified them as police officers, exited their patrol vehicle.  (Tr. at 18, 24, 47-49). Sgt. Brustein approached Espinal, and  Officer Dickerson remained about an arm's length behind the truck to provide cover if needed.  (Tr. at 41-42).  After waking Espinal, Sgt. Brustein asked him why he was there and whether he had any identification.  (Tr. at 9-10, 18, 24, 29-30, 47-49).  Espinal produced a Puerto Rican Operator's License bearing the name "Ortiz Arroyo Florentino," with a photograph that appeared to be of Espinal, which Sgt. Brustein immediately gave to Officer Dickerson to run through the National Crime Information Center ("NCIC") and the Georgia Crime Information Center ("GCIC") databases.  (Tr. at 10, 12, 42-43, 53).  In response to Sgt. Brustein's question regarding why he was there, Espinal responded that he had been in a fight with his girlfriend so a friend had driven him to that location and left him there.  (Tr. at 9, 26, 59).  Espinal also explained that his friend was not inside the McDonald's restaurant, that he did not know where his friend had gone, and that he was waiting for his friend to return.  (Tr. at 9-10, 59-60).[6]

_____

nearby Interstate 85 where suspects could simply "pull out, make one right, go about a hundred feet and get on the interstate."  (Tr. at 20-21).

[6] Sgt. Brustein testified that Espinal's explanation of why he was sitting in a parked car in a commercial parking lot at that time of night "did not make sense . . . that somebody would have somehow dropped him off with a car and left him

Officer Dickerson ran the information on the Puerto Rican Operator's License through NCIC and GCIC at 1:57 a.m., and within approximately five minutes, he received a response that there was no information on record for that particular license, which indicated to both Sgt. Brustein and Officer Dickerson that the license either contained incorrect information or that it was not valid and likely false.  (Tr. at 10-11, 42-43, 69); see also [Doc. 56].[7]  At this time, Sgt. Brustein asked for and received consent to search Espinal's truck.  (Tr. at 11, 43).[8]

During the search of the truck, Sgt. Brustein found a court order relating to a family violence arrest bearing the name "Albert Espinal," and recovered a black backpack containing black clothing from the back seat of the truck.  (Tr. at 11, 33, 44, 61).  Subsequently, Sgt. Brustein advised Espinal that the license information had not come back as valid and asked him about his true identity and the name "Albert Espinal" that was on the court order.  (Tr. at 11-12, 44).  Espinal initially denied that he was "Albert Espinal," but after further questioning, he admitted that he was in

there."  (Tr. at 28).

[7] Officer Dickerson also sent the license information directly to the Commonwealth of Puerto Rico, and at 2:37 a.m., he received a similar response that there was no information on record for that name and license number.  (Tr. at 69); see also [Doc. 56].

[8] At some point either prior to or after asking for consent, either Sgt. Brustein or Officer Dickerson asked Espinal to exit the truck and sit on a nearby curb, and Espinal complied.  (Tr. at 28-31, 41, 44, 53-54, 62, 66-68).

fact "Albert Espinal," provided a date of birth of May 2, 1978, and explained to the officers that he had given them the Puerto Rican identification card because "that's what he had on him."  (Tr. at 12, 44-45).  Officer Dickerson ran this information through NCIC and GCIC at 2:55 a.m., and within a minute, information was returned showing that Espinal had outstanding warrants for aggravated assault and was to be considered armed and dangerous.  (Tr. at 12-13, 45); [Doc. 56].  At this time, additional officers arrived at the scene as back-up, and Espinal was placed under arrest.  (Tr. at 13, 32, 45-46).  Espinal was searched incident to his arrest, and officers recovered a plastic bag containing a powdery white substance suspected to be cocaine.  (Tr. at 13, 46).

### 2.    Applicable Law

"The Fourth Amendment of the United States Constitution guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  United States v. Adigun, Criminal Case No. 1:10–cr–00202–RWS–RGV, 2011 WL 2194253, at *15 (N.D. Ga. May 4, 2011), adopted by 2011 WL 2198308, at *1 (N.D. Ga. June 3, 2011) (alteration in original) (quoting U.S. Const. amend. IV).  "The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: '(1) arrest, which must be supported by

probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.'"   United States v. Brown, 401 F.3d 588, 592 (4th Cir. 2005) (quoting United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002)).   See also United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011); United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989); United States v. Puglisi, 723 F.2d 779, 783 (11th Cir. 1984); United States v. Hunter, No. 1:07-CR-310-1-TWT, 2008 WL 552881, at *3 (N.D. Ga. Feb. 25, 2008), adopted at *1.

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . ."   Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)). See also United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (citation omitted) (there is nothing in the Constitution which prevents a police officer from addressing questions to anyone on the streets); Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006) ("This Court has decided on several occasions that a police officer does not seize an individual merely by approaching a person in a parked car.") (citations omitted).   In Bostick, the Supreme Court held that:

> [A] seizure does not occur simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable person would feel free "to disregard the police and go about his business," the encounter is consensual and no reasonable suspicion is required.  The

> encounter will not trigger Fourth Amendment scrutiny unless it loses
> its consensual nature.

501 U.S. at 434 (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 628 (1991)) (internal citation omitted).   Even if officers have no basis for suspecting a particular individual, "they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her [property] – as long as the police do not convey a message that compliance with their requests is required."   <u>Id.</u> at 434-35 (internal citations omitted).   <u>See also</u> <u>United States v. Graham</u>, No. 2:06-cr-144-WKW, 2007 WL 2746656, at *3 (M.D. Ala. Sept. 19, 2007), adopted at *1 (collecting cases).   An individual's Fourth Amendment right is implicated when he is no longer "free to leave."   <u>Michigan v. Chesternut</u>, 486 U.S. 567, 573 (1988) (internal marks and citation omitted).   <u>See also</u> <u>United States v. Mitchell</u>, 407 F. App'x 407, 409 (11th Cir. 2011) (per curiam) (unpublished).   "[T]o determine whether a particular encounter constitutes a seizure, a court must consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." <u>Bostick</u>, 501 U.S. at 439.   <u>See also</u> <u>United States v. Hunter</u>, 373 F. App'x 973, 976 (11th Cir. 2010) (per curiam) (unpublished).

A seizure arises "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). See also Miller, 458 F.3d at 1257; United States v. Lowe, No. CR 311–001, 2011 WL 2600513, at *4 (S.D. Ga. June 16, 2011), adopted by 2011 WL 2710393, at *1 (N.D. Ga. July 12, 2011). "Some factors which 'might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" Hunter, 2008 WL 552881, at *3 (quoting Mendenhall, 446 U.S. at 554). See also United States v. Edwards, No. 1:05-cr-0097-WSD-JFK, 2007 WL 2479288, at *3 (N.D. Ga. Aug. 28, 2007). Other factors courts have considered include prolonged retention of a person's personal effects, a request to accompany the officer to the station, and whether the encounter occurred in a nonpublic place or in a small, enclosed space. United States v. Laboy, 979 F.2d 795, 799 (10th Cir. 1992) (collecting cases). That an officer does not specifically advise the person of his right to walk away does not elevate the encounter into a seizure absent some other evidence of coercion or restricted freedom. United States v. Hathcock, 103 F.3d 715, 719 (8th Cir. 1997). Additionally, an officer's unexpressed intent to detain the individual had he

11

attempted to leave is irrelevant under the objective standard utilized in determining whether a Fourth Amendment seizure has occurred.  United States v. Archer, 840 F.2d 567, 572 (8th Cir. 1988) (citing Mendenhall, 446 U.S. at 554 n.6).  See also Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011).

Therefore, "[t]he key inquiry is whether, under the totality of the circumstances, 'the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"  Edwards, 2007 WL 2479288, at *3 (quoting United States v. Baker, 290 F.3d 1276, 1278 (11th Cir. 2002)).  "'That is, where a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter, the encounter with the police is consensual, and the Fourth Amendment is not implicated.'"  Id.  (quoting United States v. Ramirez, 476 F.3d 1231, 1238 (11th Cir. 2007)).  Thus, a consensual encounter becomes a Terry stop if the defendant's cooperation "is induced by 'coercive means' or if a reasonable person would not 'feel free to terminate the encounter.'"  United States v. Wright, No. 3:06cr447/MCR, 2006 WL 3483503, at *2 (N.D. Fla. Nov. 30, 2006) (quoting United States v. Perez, 443 F.3d 772, 777-78 (11th Cir. 2006)).

An investigative stop of an individual by law enforcement, as opposed to a police-citizen encounter, triggers Fourth Amendment scrutiny.  Hunter, 373 F. App'x

at 976.  An officer may briefly detain a person for an investigative <u>Terry</u> stop only when there exists "reasonable suspicion," based on articulable facts, that "criminal activity may be afoot."  <u>Terry</u>, 392 U.S. at 30; <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (citation omitted); <u>Hunter</u>, 373 F. App'x at 976.  Officers need not have probable cause.  <u>Sokolow</u>, 490 U.S. at 7 ("[T]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause.").  <u>See also</u> <u>United States v. Blackman</u>, 66 F.3d 1572, 1576 (11th Cir. 1995); <u>United States v. Diaz-Lizaraza</u>, 981 F.2d 1216, 1220 (11th Cir. 1993).

When evaluating the propriety of an investigative stop, the Court must determine whether reasonable suspicion existed in view of the totality of the circumstances.  <u>United States v. Arvizu</u>, 534 U.S. 266, 273-74 (2002); <u>United States v. Caraballo</u>, 595 F.3d 1214, 1222 (11th Cir. 2010).  Although "the concept of reasonable suspicion is somewhat abstract," courts "have deliberately avoided reducing it to 'a neat set of legal rules.'" <u>Arvizu</u>, 534 U.S. at 274 (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 695-96 (1996)).  The officer must articulate some minimal, objective justification for an investigatory stop based on the totality of the circumstances and the collective knowledge of the officers involved in the stop.  <u>Sokolow</u>, 490 U.S. at 7-8; <u>United States v. Williams</u>, 876 F.2d 1521, 1524 (11th Cir. 1989); <u>United States v. Cotton</u>, 721 F.2d 350, 352 (11th Cir. 1983); <u>United States v. Rodriguez-Alejandro</u>, 664

F. Supp. 2d 1320, 1334-35 (N.D. Ga. 2009), adopted at 1326. A reasonable suspicion determination must be based on common sense judgments and inferences about human behavior. Illinois v. Wardlow, 528 U.S. 119, 125 (2000); United States v. Cortez, 449 U.S. 411, 418 (1981); United States v. Reed, 402 F. App'x 413, 415 (11th Cir. 2010) (per curiam) (unpublished).

While the reasonable suspicion standard is not onerous, an officer's reliance on a "mere hunch" is not sufficient to establish reasonable suspicion. Arvizu, 534 U.S. at 274 (citation omitted). See also United States v. Lopez-Garcia, 565 F.3d 1306, 1313 (11th Cir. 2009). Factors that have been found to properly support reasonable suspicion include: (1) presence in a high crime area, Wardlow, 528 U.S. at 124; Adams v. Williams, 407 U.S. 143, 144, 147-48 (1972); (2) the hour at which the activity is taking place, Arvizu, 534 U.S. at 274, 277; (3) observation by law enforcement of what appears to be criminal conduct based on their experience, Terry, 392 U.S. at 22-23; and (4) evasive conduct, Wardlow, 528 U.S. at 124; United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975). See also United States v. Marcelino, 736 F. Supp. 2d 1343, 1348-49 (N.D. Ga. 2010), adopted at 1345. As part of a Terry stop, an officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the

14

individual for a crime." <u>Terry</u>, 392 U.S. at 27.  Mindful of these principles, the Court turns to the totality of the circumstances confronting Sgt. Brustein and Officer Dickerson when they encountered Espinal on July 9, 2009, and the reasonable inferences to be drawn therefrom.

### 3.    Analysis

The first issue to be decided is whether the initial encounter between Sgt. Brustein and Espinal in the McDonald's parking lot implicated the Fourth Amendment.  Espinal argues that the evidence seized and statements obtained by the officers should be suppressed because the officers did not have a reasonable, articulable suspicion that he was involved in any criminal activity to warrant his stop and subsequent detention.  [Doc. 60].  The government contends that the officers had a reasonable suspicion to approach and detain Espinal, which quickly ripened into probable cause to arrest.  [Doc. 58].  The evidence shows that Sgt. Brustein's initial contact with Espinal was a lawful encounter, and that subsequent to this initial encounter, a series of events quickly unfolded that provided Sgt. Brustein with reasonable suspicion to briefly detain Espinal, and thereafter resulted in probable cause for his arrest.

Sgt. Brustein and Officer Dickerson initiated contact with Espinal at approximately 1:40 a.m., after receiving a report about a suspicious vehicle in the

parking lot of a McDonald's restaurant that was known to have been robbed on numerous occasions.  (Tr. at 6-9, 17-21, 24, 40-41, 49-52, 62).  Upon arrival, the officers parked their patrol vehicle behind a truck that was parked in the corner of the parking lot behind McDonald's and observed Espinal asleep in the front passenger seat with the windows rolled down.  (<u>Id.</u>).  The officers exited their vehicle and Sgt. Brustein approached Espinal on foot and, after waking him, asked him why he was there and whether he had any identification.  (Tr. at 9-10, 18, 24, 29-30, 41-42, 47-49).  Espinal produced a Puerto Rican Operator's License bearing the name "Ortiz Arroyo Florentino" as well as what appeared to be Espinal's photograph, and explained that he had been in a fight with his girlfriend earlier that night so a friend had driven him to that location and left him there, but that his friend was not inside the McDonald's restaurant, that he did not know where he was, and that he was awaiting his return.  (Tr. at 9-10, 12, 26, 42-43, 53, 59-60).

"'[A]n officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure.'"  <u>United States v. Moulton</u>, Criminal Case No. 1:10-CR-00120-MHS-RGV, 2010 WL 6084115, at *5 (N.D. Ga. Nov. 22, 2010), adopted by 2011 WL 902639, at *1 (N.D. Ga. Mar. 14, 2011) (quoting <u>United States v. Ingram</u>, 151 F. App'x 597, 599 (9th Cir. 2005) (unpublished) (Reavley, J., dissenting) (internal marks and citations omitted)) (alteration in

16

original); see also United States v. Graham, 323 F. App'x 793, 798 (11th Cir. 2009)

(per curiam) (unpublished). "Therefore, the mere act of approaching [Espinal] in his

parked car was permissible, regardless of whether the officers had reasonable

suspicion of criminal activity, Graham, 323 F. App'x at 798 (citing Baker, 290 F.3d

at 1279), "and here, the officers did nothing to indicate that [Espinal] was being

seized or detained when they first approached him," Moulton, 2010 WL 6084115, at

*5.

Specifically, there is no evidence that the officers had their weapons drawn

or that they were using a threatening tone when they approached and roused

Espinal from his sleep.[9] Moreover, "the fact that the officers partially blocked the

vehicle [Espinal] was in with their patrol car[] does not transform the consensual

encounter into a seizure under the Fourth Amendment." Id. (citing United States

v. Kim, 25 F.3d 1426, 1428, 1430-31 (9th Cir. 1994) ("finding that an officer's initial

encounter with defendant, who was seated in his lawfully parked car, was not a

seizure where the officer parked his car partially blocking defendant's car,

approached defendant's car on foot, and asked for, and received permission to

question the defendant")). See also Am. Fed'n of Labor and Congress of Indus.

---

[9] In fact, Officer Dickerson even testified that when they observed Espinal
asleep in the vehicle, they wanted to also determine whether something was wrong
with him or if he needed help, and that they were "just trying to figure out exactly
what's going on." (Tr. at 57).

17

Orgs. v. City of Miami, Fla., 637 F.3d 1178, 1191 (11th Cir. 2011) ("A seizure occurs whenever the police restrain the freedom of a person to walk away.") (internal marks and citations omitted); United States v. Thompson, 546 F.3d 1223, 1228-29 (10th Cir. 2008) (finding defendant's encounter with officer consensual even though his vehicle may have been partially blocked in the parking spot); United States v. Summers, 268 F.3d 683, 687 (9th Cir. 2001) (finding interaction with defendant was consensual even where officer partially blocked defendant's vehicle stating, "[The defendant's] car was parked and was only partially blocked.  Nothing prevented him from leaving the scene on foot.").  But see United States v. Jones, 562 F.3d 768, 772-73 (6th Cir. 2009) (finding a seizure because a reasonable person would not feel free to leave once officers had blocked his vehicle).  There is simply "nothing in the record to support a finding that [the officers] did anything to impede [Espinal] from leaving. . . during the initial encounter," United States v. Robson, No. 2:07-mj-00045-PAL-PAL, 2007 WL 3232524, at *3 (D. Nev. Oct. 30, 2007), and under these circumstances, Sgt. Brustein's initial approach and questioning of Espinal was a consensual encounter and did not constitute a Terry stop.  See United States v. Drayton, 536 U.S. 199, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if

18

they are willing to listen."); Bostick, 501 U.S. at 434 ("[S]eizure does not occur simply because a police officer approaches an individual and asks a few questions."); United States v. Scott, 368 F. App'x 392, 394 (4th Cir. 2010) (per curiam) (unpublished) (finding "Fourth Amendment was not implicated when the officers approached [the defendant], roused him, and inquired about his well-being" where "defendant was slumped over in his vehicle at a time and in a neighborhood known for significant illicit drug activity."); United States v. Townsend, 206 F. App'x 444, 448 (6th Cir. 2006) (unpublished) (approaching parked vehicle at a gas station in response to a suspicious person complaint where sole occupant appeared to either have fallen asleep or passed out was permissible consensual encounter); United States v. Foster, 376 F.3d 577, 581-84 (6th Cir. 2004) (finding no seizure where three uniformed officers approached defendant as he was emerging from a parked car with the engine running and asked him his name, what he was doing, and whether he had identification).

Once Espinal provided his nonsensical explanation for why he was present in the McDonald's parking lot, Sgt. Brustein, who had arrived at that location to investigate a suspicious vehicle report from the GCPD and found Espinal sleeping in the passenger seat of a parked truck at 1:40 a.m. in a parking lot of a business known to have been robbed on numerous occasions and located in such a way that

19

it is easy for suspects to simply "pull out, make one right, go about a hundred feet and get on the interstate," (Tr. at 20-21, 28), had a reasonable suspicion, based on articulable facts, for an investigatory stop and constitutional justification to briefly detain Espinal.  United States v. Briggman, 931 F.2d 705, 707, 709 (11th Cir. 1991) (per curiam) (finding officer had reasonable suspicion to stop driver sitting in a parked car in the early morning hours in a lot near several businesses that had recently been robbed); United States v. Farmer, No. 2:07-cr-50-FtM-34SPC, 2008 WL 2397597, at *11 (M.D. Fla. June 10, 2008); see also United States v. Stewart, 631 F.3d 453, 458 (8th Cir. 2011).   Additionally, Officer Dickerson ran the information contained on the Puerto Rican Operator's License through NCIC and GCIC at 1:57 a.m., and within approximately five minutes, he received a response that there was no record for that particular license, which indicated to the officers that the license either contained incorrect information or that it was not valid and likely false.  (Tr. at 10-11, 42-43, 69); [Doc. 56].  Armed with this knowledge, Sgt. Brustein then asked for and received consent to search Espinal's truck.  (Tr. at 11, 43).  Under the totality of these circumstances, and "as each answer to [Sgt. Brustein's] investigative questions failed to allay his concerns, [Sgt. Brustein's] reasonable suspicion was bolstered," which justified "his continuing to detain [Espinal] . . . and his request to search the truck."  United States v. Hernandez, 418 F.3d 1206, 1211 (11th Cir. 2005)

20

(footnote omitted); see also United States v. Acosta, Criminal Case No. 1:09–CR–184–JEC, 2011 WL 2401829, at *27 (N.D. Ga. June 13, 2011), adopted at *1 ("[A]n officer conducting a . . . traffic stop may request consent to search the vehicle.") (citations omitted).

In fact, by the time Sgt. Brustein sought consent to search the truck, which was approximately 20 minutes after his initial encounter with Espinal, the following circumstances provided him a particularized basis for reasonable suspicion: (1) the suspicious vehicle report; (2) finding Espinal asleep at 1:40 a.m. in the front passenger seat of a truck parked at a McDonald's known to have had past robberies;[10] (3) Espinal's implausible explanation for being in the parking lot at that

---

[10] Espinal argues that if "reasonable suspicion was based on prior robberies or burglaries," then the government should have presented "evidence from the McDonald's with specific facts that particularized the officers' suspicion," but that it "failed to present any direct, objective evidence that robberies had occurred recently." [Doc. 60 at 12, 14-15, 17]. Therefore, Espinal contends that the government is offering after-the-fact reasonable suspicion. [Id. at 12]. This argument, however, overlooks the fact that Sgt. Brustein clearly testified that the McDonald's restaurant had been robbed on numerous occasions, (Tr. at 21), and the government is entitled to rely on this testimony in its reasonable suspicion analysis. Furthermore, although Espinal points out other investigative techniques that the officers could have employed rather than approaching and questioning him, [Doc. 60 at 16-17], "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques" as "[s]uch a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to indulge in unrealistic second-guessing." Sokolow, 490 U.S. at 11 (internal marks and citations omitted). See also Courson v. McMillian, 939 F.2d 1479, 1491 (11th Cir. 1991).

time of night; and (4) the fact that nothing turned up in any database matching the information on the license Espinal had provided, which reasonably led the officers to suspect that he was using and in possession of false identification.  See id. "Viewed through the lens of an experienced police officer, these circumstances added up to a reasonable suspicion that [Espinal was] involved in criminal activity." United States v. Sanchez-Sosa, Criminal Action No. 10-20108-01-KHV, 2011 WL 663180, at *5 (D. Kan. Feb. 14, 2011).

"If a detention is supported by reasonable suspicion, officers are generally permitted to detain a person to ascertain his or her identity."  United States v. Lara-Garcia, No. 2:05 CR 391 TC, 2006 WL 861384, at *5 (D. Utah Mar. 31, 2006) (citations omitted).  Indeed, although "[d]etention pursuant to a *Terry* stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop," officers may further detain a suspect where "further reasonable suspicion, supported by articulable facts, emerges."  United States v. Mercer, No. CR 06-02-M-DWM, 2007 WL 1342480, at *3 (D. Mont. May 4, 2007), adopted at *1 (internal marks and citations omitted).  That is, while "'brevity' is an important consideration, it is a highly context-sensitive one."  Farag v. United States, 587 F. Supp. 2d 436, 456 (E.D.N.Y. 2008) (citation omitted).  Here, the officers had reason to believe that Espinal had presented either a false or invalid identification, and Sgt. Brustein therefore had

"reasonable suspicion to keep asking questions as to his true identity," id., and to further investigate whether Espinal had violated Georgia law[11] since Espinal had failed to dispel Sgt. Brustein's suspicions about illegal activity and had actually raised new ones, United States v. Torres-Sanchez, 83 F.3d 1123, 1128 (9th Cir. 1996). At this point, Sgt. Brustein was justified in prolonging the stop "in order to determine if [Espinal] had committed the crime of providing a false name to a police officer." United States v. Stoltz, Crim. No. 11–096 (RHK/LIB), 2011 WL 2533872, at *8 (D. Minn. June 3, 2011), adopted by 2011 WL 25339129, at *1 (D. Minn. June 27, 2011) (citation omitted).

During the search of Espinal's truck, the officers located, among other things, a court order relating to an arrest for family violence bearing the name "Albert Espinal," and Sgt. Brustein then advised Espinal that the license information was not valid and asked him about his true identity and the name on the court order.  (Tr.

---

[11] It is a violation of Georgia law to give "a false name, address, or date of birth to a law enforcement officer in the lawful discharge of his official duties with the intent of misleading the officer as to his identity or birthdate."  O.C.G.A. § 16-10-25.  In addition, O.C.G.A. § 16-9-1 provides that a person "commits the offense of forgery in the first degree when with intent to defraud he knowingly . . . possesses any writing in a fictitious name or in such a manner that the writing as made or altered purports to have been made by . . . authority of one who did not give such authority and utters or delivers such writing."  O.C.G.A. § 16-9-1(a).

at 11-12, 44).[12]  Espinal ultimately admitted that he was in fact "Albert Espinal" and provided Sgt. Brustein with his date of birth.  (Tr. at 12, 44-45).[13]  At this time, which was approximately 2:55 a.m., Officer Dickerson ran this information through NCIC and GCIC and within one minute, he received a response that Espinal had outstanding warrants for aggravated assault and was to be considered armed and dangerous.  (Tr. at 12-13, 45); [Doc. 56].  Espinal subsequently was placed under arrest and searched incident to his arrest, which led to the discovery of a plastic bag containing a powdery white substance suspected to be cocaine.  (Tr. at 13, 32, 45-46).

Sgt. Brustein and Officer Dickerson pursued their investigation diligently and with minimal intrusion, as the total amount of time from the initial encounter to his

---

[12] Sometime prior to or after receiving consent to search, either Sgt. Brustein or Officer Dickerson asked Espinal to exit the truck and sit on a nearby curb, and Espinal complied.  (Tr. at 28-31, 41, 44, 53-54, 62, 66-68).  During the course of investigating Espinal's identity, "the officers were permitted to ask [him] to exit the vehicle."  Stoltz, 2011 WL 2533872, at *9.  That is, "[o]fficers who have conducted a lawful *Terry* stop of a vehicle may order the driver to exit the vehicle pending completion of the stop."  Id. (internal marks and citation omitted).  Additionally, at approximately 2:37 a.m., the officers had received a response from the Commonwealth of Puerto Rico that advised them that there was no information on record for the license information Espinal had initially provided the officers, which further indicated that the Puerto Rican license he had provided was in fact false.  (Tr. at 69); [Doc. 56].

[13] At this point, the officers had probable cause to arrest Espinal under O.C.G.A. §§ 16-9-1 and 16-10-25.  Therefore, the officers' continued detention of Espinal was no longer dependent upon reasonable suspicion because probable cause existed to arrest him for a violation of Georgia law.  See Acosta, 2011 WL 2401829, at *63.

24

arrest was approximately one hour and fifteen minutes.  (Tr. at 7-8); [Doc. 56]; see also United States v. Gil, 204 F.3d 1347, 1350 (11th Cir. 2000) (per curiam) (finding one hour and fifteen minute detention of defendant in handcuffs in back of a patrol car reasonable under *Terry*); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988) (finding *Terry* stop of fifty minutes duration reasonable).  In sum, the totality of the circumstances provided the officers with reasonable suspicion to detain Espinal for further investigation, which ripened into probable cause to arrest him. Since the officers had probable cause for the warrantless arrest of Espinal, evidence was lawfully seized from his person incident to his arrest.[14]  Accordingly, it is **RECOMMENDED** that Espinal's motion to suppress evidence and statements, [Doc. 31], be **DENIED**.

---

[14] Espinal seeks to suppress all fruit of the alleged illegal detention and seizure, including all statements he made at the scene of the stop, as well as any evidence recovered by the officers. [Doc. 60 at 18]. Specifically, Espinal argues that "[w]hen this Court finds that the detention is illegal, all else in this case is an 'exploitation of that illegality' and all evidence and statements should be suppressed, despite a verbal consent." [Id.].  Having found that the initial stop and subsequent detention were lawful, Espinal's fruit of the poisonous tree argument fails.  However, the government has conceded that it will not offer any statements beyond those that Espinal made at the scene of his arrest.  (Tr. at 3-5); see also [Doc. 58 at 2-3].

25

## II.  CONCLUSION

For the foregoing reasons and cited authority, Espinal's unopposed motion for a bill of particulars, [Doc. 33], is **GRANTED**, and it is hereby **RECOMMENDED** that Espinal's motion to suppress evidence and statements, [Doc. 31], be **DENIED**.

There are no other pending matters before the Magistrate Judge,[15] and the undersigned is aware of no problems relating to the scheduling of this case. Accordingly, it is **ORDERED** and **ADJUDGED** that this case is hereby certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 29th day of August, 2011.

*Russell G. Vineyard*

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[15] Motions filed by co-defendant Jose Reyes have been addressed in a separate Report and Recommendation.

26